# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

UNITED STATES OF AMERICA    :
                            :
          v.                :        No. 2:05-CR-130-3
                            :
HUY HOANG NGUYEN,           :
          Defendant.        :

## OPINION AND ORDER

Huy Hoang Nguyen is charged with conspiracy to import marijuana into the United States, in violation of 21 U.S.C. §§ 963 and 960 (b)(4).  Before the Court is Nguyen's Motion to Suppress Evidence and Statements (Doc. 29).  For the reasons set forth below, the motion is DENIED.

## I. FACTUAL BACKGROUND

On July 10, 2006, the Court held an evidentiary hearing and heard testimony from Drug Enforcement Administration ("DEA") Resident-Agent-In-Charge Brian Welch, DEA Special Agent Thomas Doud, and Corporal Peter Chapman of the Burlington, Vermont Police Department.  The following facts are taken from the evidence presented at the hearing.

### A.   The arrest of Jansen-Allen and Highfield

On November 2, 2005, Border Patrol agents in northern Vermont arrested two Canadian citizens, David Jansen-Allen and Benjamin Highfield, near the Canadian border in possession of 110 pounds of marijuana.  Jansen-Allen and Highfield told DEA agents

that they had been instructed by their Canadian supplier, whom they knew as "Tojo," to leave their vehicle containing marijuana at the University Mall in South Burlington, where it would be retrieved by an Asian male from the Boston area known as "Benny."

During the interrogation of Jansen-Allen, at approximately 2:30 a.m. in the early morning of November 3, agents tape-recorded a conversation between Jansen-Allen and an individual who was identified as "Tojo" on the caller ID display of Jansen-Allen's cellular phone.  When DEA Agent Thomas Doud played back the tape, he discovered that Jansen-Allen had betrayed to the caller that he and Highfield were in police custody and that the marijuana had been seized.

**B.**    **The agents' encounter with Nguyen**

After listening to Jansen-Allen's phone call, the agents became concerned that the courier who had been waiting to receive the marijuana would soon learn that the shipment had been intercepted.  Consequently, a number of agents immediately proceeded to the vicinity of the University Mall, which was about ten minutes from the DEA station, to search for a Massachusetts vehicle operated by an Asian male.  Resident-Agent-In-Charge Brian Welch testified that he sent agents to search the mall parking lot and nearby gas stations and motels.  Welch and Border Patrol Agent Keith Atkins rode in Welch's unmarked vehicle to the Holiday Inn at the intersection of Dorset Street and Williston Road in South Burlington to scan the parking lot for a vehicle

with Massachusetts plates idling or with a passenger inside.
Based on his 21 years of DEA experience, Welch knew that couriers
often use motel parking lots to conduct secondary buys or to wait
for the arrival of narcotics deliveries.  He chose to travel to
the Holiday Inn first because of its close proximity to the
University Mall.

When they arrived at the Holiday Inn, Agents Welch and
Atkins scanned the parking lot and saw no suspicious vehicles.
At approximately 2:50 a.m., they were stopped at a red light
waiting to exit the parking lot when they saw a Dodge Intrepid
pass by them heading west on Williston Road toward the entrance
to Interstate 89, which was about 50 yards away.  Welch could see
that the vehicle had Massachusetts plates, and Atkins told Welch
that he could see that the driver was an Asian male.  The vehicle
appeared to be traveling at a high rate of speed.

The agents pursued the car in order to confirm whether
Atkins' identification was correct, following it as it turned
south onto Interstate 89.  Welch accelerated quickly to catch up
to the vehicle and then traveled alongside it for a distance.
Atkins verified that the driver was an Asian male, and he also
told Welch that the driver was looking straight ahead and not
glancing over at the agents' vehicle.  This struck Welch as
unusual, since in his experience drivers often glance over if
another vehicle drives alongside them for a significant distance,
especially late at night when there are few drivers on the road.

C.   **The stop and initial questioning of Nguyen**

Suspecting that the driver of the Dodge was the courier who had come to Vermont to pick up the marijuana, Agent Welch activated his emergency lights and initiated a vehicle stop south of Exit 13.  The stop took place within just a few minutes of the agents' sighting of the car near the Holiday Inn.  Welch radioed to the other DEA units that he had made a stop, and he identified the location.  Welch approached the driver's side of the vehicle, while Atkins approached the passenger side.  According to Welch, he was wearing a police vest and badge, and neither agent had a weapon displayed.  The agents ascertained that the driver was the only occupant of the vehicle.

Welch asked the driver for his license and registration and discovered that the driver was Huy Hoang Nguyen, a resident of Medford, Massachusetts.  Welch asked for Nguyen's keys, which he placed on the roof of the car, and he asked Nguyen to place his hands on the steering wheel.  Nguyen did so, and Welch could see that Nguyen's hands were shaking and that he appeared extremely nervous.

Welch asked Nguyen why he was in the Burlington area, to which Nguyen replied that he was looking at ski chalets in the area.  Welch asked where the chalets where, and Nguyen responded that he did not know.  Welch asked Nguyen if he had any brochures for the chalets, and Nguyen said he did not.  Nguyen told Welch that he had been shown these cabins by a friend named "Kenny,"

but he could not remember Kenny's last name, nor did he have his phone number.

Within five minutes of the initial stop, Agent Doud arrived on the scene.  Welch informed Doud what had occurred thus far during the stop and stated that he found Nguyen's story to be suspicious.  Doud recalled that two months earlier, the DEA had assisted the Border Patrol with the seizure and controlled delivery of about 70 pounds of marijuana from a Canadian courier who was to deliver the drugs to an Asian male in Medford, Massachusetts.  The similarity of the current situation struck Doud as suspicious.

Wishing to question Nguyen further, Doud asked Nguyen to exit the vehicle and step over the guardrail where they could speak safely off the road.  Doud proceeded to ask Nguyen in greater detail about his activities in Burlington.  Nguyen told Doud that he had come to Vermont from the Boston area the previous afternoon around 3 p.m. to look at ski chalets around Burlington.  Doud found this to be odd, because given the time of year, Nguyen would have had only 90 minutes of daylight to conduct his visit.  Nguyen told Doud that his friend Kenny Choy had shown him two ski cabins, but he did not know where the chalets were, whether they were north or south of Burlington, or the names of any ski resorts nearby.  Nguyen told Doud that after looking at the chalets, he stayed in the Burlington vicinity to eat and then checked into a Comfort Inn.  Nguyen said that

shortly before being stopped by the agents, he had checked out of the motel, intending to head back to Medford.  When Doud asked Nguyen why he had left in the middle of the night after staying only a few hours, Nguyen replied that he wanted to beat the traffic.

D.   **The canine sniff and search of Nguyen's vehicle**

At 3:04 a.m., while Agent Doud spoke with Nguyen, Burlington Police Corporal Peter Chapman, a canine handler, arrived at the scene with his drug-sniffing dog, Zeus.  Chapman testified that he had finished his shift and was on his way home along Interstate 89 when he came upon the stopped vehicles south of Exit 13.  Since police coverage along the Interstate is sparse late at night, Officer Chapman decided to stop and offer his assistance.

Welch asked Chapman to conduct an exterior sniff of the vehicle with Zeus.  Chapman and Zeus circled the vehicle, and Zeus alerted twice, once at the driver's side door and once at the rear passenger door.  Chapman informed Welch that the dog had alerted, indicating the presence of a narcotic.

Doud then asked for Nguyen's consent to search the vehicle. Nguyen consented to a search of the passenger compartment, but he refused to give permission to search the trunk.  He told the agents that the trunk contained personal items that he did not want the agents to see, but he would not say what these items were.

The agents decided they had probable cause to search the
entire vehicle.  Doud placed Nguyen in handcuffs, explaining to
him that he was not under arrest but that he was being handcuffed
to prevent flight and obstruction of justice and to ensure the
agents' and his own safety.  Welch opened the trunk of the
vehicle, and both he and Chapman smelled marijuana.  Chapman
permitted Zeus to enter the trunk to conduct an additional sniff
search, and Zeus alerted to a cardboard box that contained two
plastic bags.  Doud asked Nguyen if the bags contained money, and
Nguyen said they did.  Nguyen further stated that he thought the
bags contained about $147,000.  A search of the bags revealed
that they contained $171,700.

E.    **The subsequent questioning of Nguyen**

Nguyen was then informed that he was under arrest, and he
was placed into Agent Welch's vehicle.  Doud and Welch drove
Nguyen to DEA headquarters in Burlington, with Welch driving,
Doud in the passenger seat, and Nguyen in the back seat.  Doud
testified that he told Nguyen not to say anything while he
explained the benefits of cooperating and then informed Nguyen of
his rights under Miranda v. Arizona, 384 U.S. 436 (1966).  After
reciting the warnings, Doud asked Nguyen if he understood his
rights, and Nguyen nodded.  Welch asked Nguyen to verbally
confirm that he understood, and Nguyen said "yes."

Doud then asked Nguyen if he was willing to cooperate, and
Nguyen answered that he wasn't sure, stating that "things happen

to people." Doud and Welch interpreted this to mean that Nguyen was concerned for his safety, and Welch explained to Nguyen that protective measures could be taken.

When they arrived at the DEA station, Doud seated Nguyen in the hallway and asked him if he was willing to answer questions. Nguyen responded that he was. Nguyen told agents that he had been recruited by persons in the Boston area to drive to Vermont and pick up marijuana, then deliver it back to Massachusetts. Nguyen did not wish to identify the individuals who had recruited him. He told agents this was the second time he had done this, having driven to Vermont and picked up three hockey bags of marijuana and return to Massachusetts the week previously. Nguyen explained that the individuals he worked for used storage units to conceal their money and drugs.

Nguyen told agents that shortly before his arrest he had learned from contacts in Massachusetts that Jansen-Allen and Highfield had been arrested, and he had decided to return to the Boston area. Nguyen had planned to return the money to a storage unit upon his return.

F.   **Additional evidence recovered as a result of Nguyen's arrest**

During a search of the car subsequent to Nguyen's arrest, agents found a piece of paper that contained directions to an apartment complex in Waltham, Massachusetts. The paper contained the notation, "The Ridges, 206 Ridge Lane, Apartment 107, Garage G-28." Agents also found two keys. On the evening of November

3, 2005, Agent Doud drove to the complex, where he discovered that an individual matching Nguyen's description had rented apartment 107.  He found that the keys from Nguyen's vehicle fit into the locks of apartment 107 and garage G-28, and he requested a canine unit to conduct an exterior drug-sniff of the apartment and garage.  After a positive alert for narcotics, Agent Doud obtained a state court search warrant for the apartment and garage.  He and other agents found seven pounds of packaged marijuana in the garage.  The marijuana found in the garage was packaged in a manner similar to that seized from Jansen-Allen and Highfield.

One week later, an inventory search was conducted of Nguyen's impounded car, and one pound of marijuana was discovered in the vehicle's spare tire compartment.

## II. <u>DISCUSSION</u>

Nguyen asserts that his Fourth Amendment rights were violated when the agents stopped his car, detained him, and searched his trunk.  He also argues that the statements he made subsequent to being stopped were obtained in violation of the Fifth Amendment.  Accordingly, he moves to suppress his statements and all evidence obtained as fruits of the stop and search.  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).

**A.** **Whether the stop of Nguyen's car violated the Fourth
Amendment**

1.  The applicable law

A law enforcement officer "seizes" a vehicle and its
occupants within the meaning of the Fourth Amendment whenever he
or she initiates a vehicle stop, however brief the stop.  Whren
v. United States, 517 U.S. 806, 809-10 (1996).  Accordingly, the
Constitution requires that an automobile stop be reasonable under
the circumstances.  Id.  A stop and brief detention of a vehicle
is considered reasonable if the officer "has reasonable suspicion
supported by articulable facts that criminal activity may be
afoot[.]"  United States v. Swindle, 407 F.3d 562, 566 (2d Cir.
2005).

While there is no precise definition for reasonable
suspicion, "the officer must be able to articulate more than an
'inchoate and unparticularized suspicion or hunch' of criminal
activity."  Illinois v. Wardlow, 528 U.S. 119, 123-24 (2003)
(quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)).  However, the
Second Circuit has noted that the level of proof is "considerably
less than proof of wrongdoing by a preponderance of the
evidence."  United States v. Sokolow, 490 U.S. 1, 7 (1989).  In
order to demonstrate reasonable suspicion, "the subjective
intentions or motives of the officer making the stop are
irrelevant."  United States v. Bayless, 201 F.3d 116, 133 (2d
Cir. 2000).

When evaluating whether a stop was reasonable, the court

"must consider the totality of the circumstances surrounding the stop." Id.  This determination should be made "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." Id.  "In the case of suspected narcotics trafficking, an officer's suspicion will be reasonable if, considering the totality of the circumstances surrounding the stop, the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." United States v. Glover, 957 F.2d 1004, 1010 (2d Cir. 1992); see also United States v. Cortez, 449 U.S. 411, 418 (1981) ("[A] trained officer draws inferences and makes deductions--inferences and deductions that might well elude an untrained person.").

   2.   The legality of the stop

     The circumstances surrounding the agents' encounter with Nguyen strongly suggested that he was the individual to whom Jansen-Allen and Highfield had planned to deliver the marijuana. Not only were Nguyen's ethnicity, gender, and license plate consistent with the description provided by Jansen-Allen and Highfield, but the timing and location matched as well.  The agents observed Nguyen speeding away from the precise area where Jansen-Allen and Highfield had been instructed to leave the marijuana, just minutes after Jansen-Allen betrayed to his supplier that he was in custody.  As experienced drug investigators, both Agents Welch and Atkins were well qualified

to evaluate the consistency between Nguyen's behavior and that typical of individuals involved in large-scale drug transactions. The fact that Nguyen was on Williston Road at 2:50 a.m., when traffic is extremely light, coupled with Nguyen's evasive behavior--driving at a high rate of speed and not looking at the agents' vehicle as it drove beside it for a distance--added to the agents' suspicions that Nguyen was involved in illegal activity.

For these reasons, the Court concludes that Welch and Atkins had reasonable suspicion to believe that Nguyen was involved in illegal drug-related activity, and therefore they did not violate Nguyen's Fourth Amendment rights by stopping his car.

**B.   Whether the detention was reasonable in scope and duration**

1.   The applicable law

Even if the initial stop of a vehicle was reasonable, the subsequent detention of its occupants will violate the Fourth Amendment if it is unreasonable in scope and duration.  In evaluating the reasonableness of an investigative detention, the court must consider "whether the officer's action . . . was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20. The duration of the detention is "[a] critical factor in evaluating the intrusiveness of a stop[.]"  Glover, 957 F.2d at 1011.  The burden is on the government "to demonstrate that the seizure it seeks to justify on the basis of a reasonable

suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500 (1983).

There is no fixed standard for determining if the scope of a detention is reasonable; instead, "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case." Id. In addition, courts have recognized the "need to allow authorities to graduate their responses to the demands of any particular situation." United States v. Place, 462 U.S. 696, 709 n.10 (1983); see also Terry, 392 U.S. at 10 ("[P]olice are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess."). Thus, "after a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003); accord United States v. Sparks, 2004 U.S. Dist. LEXIS 2278, *15 (S.D.N.Y. Feb. 13, 2004).

2.   The length of the detention

Nguyen asserts that it was unreasonable for the agents to detain him for the approximately fifteen minutes that elapsed prior to the arrival of the canine unit. The Supreme Court has ruled that there is "no rigid time limitation on Terry stops."

United States v. Sharpe, 470 U.S. 675, 685 (1985).  Rather, an investigative detention must "last no longer than is necessary to effectuate the purpose of the stop."  Royer, 460 U.S. at 500.  In determining the reasonableness of the duration, the Court must consider "whether the police diligently pursue their investigation."  Place, 462 U.S. at 709.

Applying these standards, the Court finds that Nguyen's detention was not unreasonable in duration because the agents diligently pursued their investigation of his suspicious activities and because the stop lasted no longer than necessary to determine whether Nguyen was involved in criminal activity.

Nguyen argues that a different result is called for by United States v. Dortch, 199 F.3d 193 (5th Cir. 1999), in which the Fifth Circuit held that it was unreasonable to detain a suspect for twenty minutes while awaiting the arrival of a canine unit.  Dortch is distinguishable from the case at hand, however. In that case, the defendant was stopped for a traffic violation, and a computer check of his record came up clean, but the officers continued to detain him while they waited for a canine unit to arrive and conduct a sniff search.  The court held that the extended detention was unreasonable because "there was no reasonable or articulable suspicion that Dortch was trafficking in drugs."  Dortch, 199 F.3d at 199.

Here, by contrast, Nguyen was stopped based on reasonable suspicion that he was involved in illicit drug smuggling, and the

fifteen-minute detention was necessary to permit the agents to follow up on this suspicion.  The agents used the detention to question Nguyen about his activities, not to await the arrival of the canine unit; they decided to conduct the sniff search only after Corporal Chapman happened upon on the scene with his dog. Dortch thus does not change the Court's conclusion that the duration of the detention was reasonable.

   3.   Whether the canine sniff was unreasonable

   Nguyen also asserts that the agents' decision to use a drug-sniffing dog based on the information they possessed at the time constituted an unreasonable intrusion on his Fourth Amendment rights.  In evaluating whether the investigative methods employed during the course of a detention are reasonable, the court must consider whether the methods were "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  Royer, 460 U.S. at 500.  In Glover, the Second Circuit held that conducting a canine "sniff test" when a detained individual is suspected of narcotics possession is a "minimally intrusive means of confirming or dispelling the officers suspicions."  Glover, 957 F.2d at 1013.

   The Court finds that in this case, the canine drug-sniff was directly related to the justification for the initial stop, namely Welch and Atkins' reasonable suspicion that Nguyen was a narcotics courier fleeing from the scene of an intended marijuana transaction.  Moreover, even if the canine sniff had not been

reasonably related to the initial justification, the agents were justified in expanding the scope of the investigation as their suspicions mounted.  Although Nguyen argues that he answered all of the agents' questions and should not have been detained further, the agents' suspicions were actually heightened by Nguyen's unsatisfactory answers concerning the ski chalets and the late-night motel check-out.  Nguyen could not tell agents where the chalets were, whether they were north or south of Burlington, or the names of any ski resorts near the chalets. His story that he checked out of the motel in the middle of the night "to beat the traffic" understandably struck the agents as suspicious.  The agents were thus justified in conducting the canine sniff, which constituted the least intrusive means of speedily resolving their suspicions.

C.   **Whether the search of Nguyen's vehicle violated the Fourth Amendment**

1.   The applicable law

Under the automobile exception to the Fourth Amendment warrant requirement, a law enforcement officer may conduct a warrantless search of a vehicle if he or she has probable cause to believe that the vehicle contains contraband or other evidence of a crime.  United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004).  Probable cause to search exists "where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief

that evidence of a crime will be found in the place to be searched." Id. (alterations in original).

  2.  The legality of the search

     The government argues that Agents Doud and Welch possessed probable cause to search Nguyen's vehicle after Nguyen withheld consent to search his trunk.  Although a suspect's refusal to consent cannot contribute to a finding of probable cause, United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997), other factors existed that were sufficient to furnish the agents with probable cause to believe that the vehicle contained contraband.  After stopping a man who fit the drug courier description provided by Jansen-Allen and Highfield, the agents asked Nguyen a number of open-ended questions to dispel their suspicions.  Nguyen, however, could not provide plausible responses to these questions, thus indicating further that he was involved in some sort of illegal activity.  Subsequently, a drug-sniffing canine alerted twice on Nguyen's vehicle.  These factors, taken together, unquestionably established probable cause to justify the search of the car.  See, e.g., Glover, 957 F.2d at 1013 (holding that probable cause was established when drug dog "hit" on suspect's bags).

### D.   Whether Nguyen was "in custody" during his questioning by the roadside

1.   The applicable law

Under Miranda, a police officer may not interrogate a suspect who has been taken "into custody" without first warning him "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479.  If no warning is given, the prosecution may not use statements obtained during the interrogation in its case.  United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004).  In the Second Circuit, the standard for determining whether an individual is in custody for Miranda purposes is "whether a reasonable person would have understood himself to be subjected to restraints comparable to those associated with a formal arrest."  Id. at 671.  Two important factors in making this determination are whether "a reasonable person in the suspect's shoes would have understood that his detention was not likely to be temporary and brief," and whether he "would feel that he was completely at the mercy of the police."  Id. at 675 (citing Berkemer v. McCarty, 468 U.S. 420, 437, 438 (1984)).

A certain level of restraint is acceptable in the course of a reasonable investigative detention in the interest of ensuring an officer's safety.  Terry, 392 U.S. at 30.  Following a vehicle

stop, an officer may order a suspect to exit the vehicle.
Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977); see also Mollica
v. Volker, 229 F.3d 366, 369 (2d Cir. 2000) ("[I]f a stop is
lawful, passengers and drivers have no Fourth Amendment interest
in not being ordered out of the stopped vehicle.").

Although the use of handcuffs is "generally recognized as a
hallmark of a formal arrest," Newton, 369 F.3d at 675, handcuffs
do not automatically turn a detention into a custodial
interrogation.  See, e.g., United States v. Cota, 953 F.2d 753,
758-59 (2d Cir. 1992); United States v. Touzel, 409 F. Supp. 2d
511, 522 (D. Vt. 2006).  Instead, the court must consider "all
the circumstances presented" to determine whether the standard
for custodial interrogation has been met.  Newton, 369 F.3d at
677.

2.   Whether the agents placed Nguyen in custody

Nguyen asserts that he was placed in custody as soon as his
vehicle was stopped by Agents Welch and Atkins because from the
time the agents initiated the stop, they were convinced that he
was the courier described by Jansen-Allen and Highfield.  The
standard for determining if a suspect is in custody for Miranda
purposes, however, is not what the officers believed, but what a
reasonable person in Nguyen's position would have believed.  See
Newton, 369 F.3d at 671.  Hence, the Court cannot accept Nguyen's
assertion that he was in custody from the moment his vehicle was
stopped.  Nguyen had no reason at that point to believe that his

detention would not be temporary and brief or that he was completely at the mercy of the police.

Welch's demand for Nguyen's keys and Doud's request that he exit the vehicle did not transform the detention into a custodial situation.  The agents suspected that Nguyen had been stopped in the process of fleeing from the site of an intended narcotics purchase, and they were entitled to take measures that would prevent Nguyen from attempting to flee again.  Moreover, none of the agents displayed a weapon or used coercive physical force during the course of the questioning.

The Court must also reject Nguyen's claim that Agent Doud placed him in custody by handcuffing him prior to the search of his car.  This Court addressed a similar situation in Touzel.  In that case, an officer told the defendant that he was not under arrest, but that he would be handcuffed temporarily "for your safety and mine."  Touzel, 409 F. Supp. 2d at 516.  The Court concluded that in light of the briefness of the detention and the fact that the encounter took place at night in a remote area, a reasonable person in Touzel's position would not have considered himself to be in custody.  Id. at 522.

The circumstances of this case compel a similar conclusion. The period between the handcuffing and Nguyen's formal arrest was brief, lasting only for the duration of the canine search.  Agent Doud made clear to Nguyen that he was not under arrest, and he explained that he was being handcuffed merely in order to prevent

flight and obstruction of justice and to ensure the agents' and Nguyen's own safety.  While such a notification "does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained," Newton, 369 F.3d at 676, the other circumstances substantiated Doud's statement that the handcuffing was motivated by safety considerations.  Just as in Touzel, it was late at night and traffic along the highway was extremely light, creating a significant risk of flight.

For these reasons, the Court concludes that Nguyen was not in custody within the meaning of Miranda prior to his formal arrest.

## E.   Whether Nguyen made a valid waiver of his rights prior to his questioning at the DEA office

### 1.   The applicable law

The burden rests on the government to show that after being informed of his or her constitutional rights, the accused made a knowing and voluntary waiver of those rights.  United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995).  The government must prove a valid waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986).  "[A]n express statement by the defendant is not necessary to establish such a waiver."  United States v. Rubio, 709 F.2d 146, 152 (2d Cir. 1983); accord North Carolina v. Butler, 441 U.S. 369, 373 (1979). As the Supreme Court stated in Butler, "in at least some cases waiver can clearly be inferred from the actions and words of the person interrogated."  Id. at 373.  In Rubio, the court concluded

that the defendant had waived his Miranda rights based upon his apparent intelligence and the fact that there was no credible evidence that the statements were made after "protracted interrogation" or "through physical or mental abuse."  Rubio, 709 F. 2d at 153.

However, the Supreme Court has also recognized that a waiver cannot be presumed from an accused's silence or eventual confession, but that the evidence must show that the accused intelligently and understandingly waived his or her rights. Miranda, 384 U.S. at 475.  Whether a confession was voluntary "may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials."  United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

   2.   Whether Nguyen made a valid waiver

The Court concludes that the government has met its burden of establishing that Nguyen waived his Fifth Amendment right against self-incrimination.  After advising Nguyen of his Miranda rights, Agent Doud asked Nguyen if he understood his rights, and Nguyen nodded.  Nguyen then verbally confirmed that he understood his rights.  Once at the DEA station, Agent Doud asked Nguyen if he was willing to talk, and Nguyen answered that he was. Although Nguyen expressed concerns for his safety and did not answer all of the agents' questions, he did answer many of them.

There is also no evidence that Nguyen was subjected to coercion or lengthy interrogation prior to making any statements.  For these reasons, the Court concludes that Nguyen made a valid waiver of his rights.

### CONCLUSION

For the foregoing reasons, Nguyen's motion to suppress is DENIED.


Dated at Burlington, Vermont this 7th day of August, 2006.




/s/ William K. Sessions III
William K. Sessions III
Chief Judge